IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARIA ANTOINETTE THOMAS     )
)    Case No. 08 C 2727
               Plaintiff,   )
)    Judge Virginia M. Kendall
    v.              )
)
CITY OF CHICAGO,       )
)
              Defendant.  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Maria Antoinette Thomas, ("Thomas") filed suit against her employer, Defendant

the City of Chicago ("the City"), alleging that she experienced various forms of employment

discrimination.  Specifically, in Counts I and II of her First Amended Complaint, she claims

violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., for

harassment and discrimination (Count I) and retaliation (Count II).[1]  After the City moved for

summary judgment on both counts, Thomas voluntarily abandoned her retaliation claim, leaving

Count I as the sole pending claim.  For the reasons stated, the City's Motion for Summary Judgment

is granted.

## STATEMENT OF UNDISPUTED FACTS

Thomas, a Jehovah's Witness, worked as a probationary occupational health nurse for the

Chicago Police Department's Medical Section beginning in April 2007.  (Pl. 56.1 Resp. ¶¶ 2, 3.)

The Medical Section oversees medical care for police officers who are unable to work due to injury

---

[1]  In Counts III and IV of her First Amended Complaint, Thomas alleged violations of the Rehabilitation
Act, 29 U.S.C. § 701 *et seq*., and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.  After the Court
dismissed Counts III and IV without prejudice for failure to state a claim, Thomas did not replead those claims.

or illness. (Pl. 56.1 Resp. ¶ 16.)[2]  As an occupational nurse, Thomas interviewed officers to determine their need for additional treatment or additional time away from work, referred officers for treatment, determined dates that officers could return to work, determined potential work restrictions for officers returning to work and recorded her notes in the police department's computerized tracking system. (Pl. 56.1 Resp. ¶ 18.) Thomas did not provide medical care to patients. (Def. 56.1 Resp. ¶ 61.)

Thomas reported to Barbara Hemmerling ("Hemmerling"), Medical Section Director. (Pl. 56.1 Resp. ¶ 18.) Hemmerling did not have the authority to hire, fire, promote, demote, transfer or reassign employees. (Pl. 56.1 Resp. ¶ 17.)[3]  At the time of the incidents giving rise to this suit, Hemmerling reported to Inspector Thomas Schaedel ("Schaedel"), who in turn reported to Kimberley O'Connell ("O'Connell"), Director of Staff Development. (*Id.*)

While she worked at the City, Thomas received many questions about her faith from her coworkers. (Pl. 56.1 Resp. ¶ 29.) The questions did not offend her because she did not mind talking about her religion. (*Id.*; Pl. 56.1 Resp. ¶ 31; Thomas Dep. at 101:5-7.) Approximately two or three weeks after Thomas started working with the City, her coworkers invited Thomas to a potluck dinner during their shift to welcome her and Susan Salinski, another new employee, to the group.

---

[2]  Citations to Plaintiff's Local Rule 56.1 Statement in Opposition to Defendant's Motion for Summary Judgment have been abbreviated to "Pl. 56.1 Resp. ¶ __." Likewise, citations to Defendant City of Chicago's Response to Plaintiff's Statement of Additional Facts have been abbreviated to "Def. 56.1 Resp. ¶ __."

[3]  Thomas attempts to controvert this statement by claiming that Hemmerling admitted that she could make recommendations regarding the termination of employees who reported to her. Nothing in the cited portion of Thomas' response controverts the statement that Hemmerling did not have the authority to make personnel decisions; rather, Thomas' response corroborates the statement by reinforcing that Hemmerling could only make personnel *recommendations*, not actual decisions. Additionally, Thomas attempts to controvert this statement by describing a situation where Hemmerling threatened to fire her. However, the fact that Hemmerling *threatened* to fire Thomas does not necessarily controvert the statement that Hemmerling did not have the *authority* to fire her. Therefore, because Thomas has not controverted Pl. 56.1 Resp. ¶ 17 with facts from the record, the Court deems Pl. 56.1 Resp. ¶ 17 admitted. *See* L.R. 56.1(b)(3)(C).

(Pl. 56.1 Resp. ¶¶ 29-30; Thomas Dep. at 104:8-13.)  While Thomas originally agreed to attend, she eventually learned that her new coworkers planned the dinner to welcome the new employees and to celebrate someone's birthday.  (Thomas Dep. at 104:8-12.)  Thomas explained that she did not participate in birthday parties due to her religion.  (*Id.*)  One of her coworkers, Sharese Jones ("Jones"), asked Thomas if she could overlook that the dinner was partially to celebrate someone's birthday because the purpose of the dinner was also to celebrate the arrival of Thomas and Salinski. (*Id.* at 104:16-22.)  Thomas responded that she could not overlook the fact that the dinner was a birthday party but she indicated that she appreciated the thought.  (*Id.* at 105:3-4.)  Neither Thomas nor Jones said anything further about the dinner.  (*Id.* at 105:8-9.)  Jones did not make a derogatory comment about Thomas' religion during the exchange.  (Pl. 56.1 Resp. ¶ 30.)  Nobody else criticized her for choosing to not attend the event.  (Thomas Dep. at 105:10-12.)

Oftentimes, Beth Finnegan ("Finnegan"), the person in charge of referring officers for particular medical treatment, disagreed with Thomas' proposed course of treatment.  (Pl. 56.1 Resp. ¶ 32; Thomas Dep. at 112:22-23.)  For example, approximately two weeks after Thomas started working for the City, Thomas told Finnegan that an officer should see a plastic surgeon to close a wound instead of receiving stitches due to the possibility that the officer had suffered nerve damage. (Thomas Dep. at 111:11-17.)  Instead of following Thomas' recommendation, Finnegan told Hemmerling that the officer should see a doctor to receive stitches.  (*Id.* at 111:22-112:8.) Hemmerling agreed and had the officer see a doctor instead of a plastic surgeon.  (*Id.*)  After observing the wound, the doctor sent the officer to the plastic surgeon to have the wound mended. (*Id.*)  Thomas believes that Finnegan disagreed with her assessments on a daily basis in order to undermine or sabotage her work.  (Pl. 56.1 Resp. ¶ 32; Thomas Dep. at 218:21-219:3.)  She also believes that other employees took files from her office to sabotage her.  (Pl. 56.1 Resp. ¶ 34.)  On

one occasion, after Thomas realized that she did not have a specific file in her office, she found it in Mary Delgado's ("Delgado") office. (*Id.*; Thomas Dep. at 124:15-21.) Delgado, one of Thomas' coworkers, had the file because Thomas asked her to make a medical referral on that file. (*Id.*) The record does not contain evidence of any other situations when files went missing from Thomas' office. (Pl. 56.1 Resp. ¶ 34.)[4]

In May 2007, Thomas' coworkers held another celebration at work. (Pl. 56.1 Resp. ¶ 30.) When Thomas did not participate, a coworker identified only as Bonita told Thomas that a Jehovah's Witness who used to work in the Medical Section used to attend the celebrations at the office. (Thomas Dep. at 107:1-4.) Thomas walked away from the conversation at the moment Bonita said that the other woman would attend the celebrations. (*Id.* at 105:18-24.) During this exchange, Bonita did not make a derogatory comment about Thomas' religion. (Pl. 56.1 Resp. ¶ 30.)

Also in May 2007, Thomas' daughter experienced health problems. (Thomas Dep. at 69:1-9.) After Thomas received authorization to leave work early to tend to her daughter, who was in a hospital's intensive care unit, Thomas claims that Hemmerling went to her office and told her, "I will pray for you but not a stupid Jehovah prayer." (Pl. 56.1 Resp. ¶ 35; Thomas Dep. at 68:5-8.) On another occasion, Hemmerling and Thomas disagreed over how to proceed with respect to a patient's treatment. (Thomas Dep. at 61:10-19.) As their conversation about the incident ended and Hemmerling walked away from Thomas, Thomas claims that Hemmerling mumbled under her

---

[4]  In Pl. 56.1 Resp. ¶ 34, Thomas appears to describe another incident when someone moved one of her files by stating, without citation to the record, "Once a file was removed from Plaintiff's office and placed behind a book in her office. When asked if she had made the referral she said: 'No.' She did not want to follow my recommendations for the referral. Plaintiff retrieved the file and took it to another referral clerk's office. When Plaintiff complained to Ms. Hemmerling she told her do not go to that clerk anymore just take all her referrals to PO Andre [sic]. She did not distribute the referrals equally." From that statement, the Court cannot decipher who moved the file or who refused to follow Thomas' recommendations. Because the statement lacks foundation, contains inadmissable hearsay and is not responsive to the City's asserted fact, the Court strikes Thomas' response in Pl. 56.1 Resp. ¶ 34 and deems the statement admitted.

breath that Thomas was a "stupid Witness," apparently making reference to Thomas' religion. (Pl. 56.1 Resp. ¶ 35; Thomas Dep. at 61:15-19.) Hemmerling, however, denies that she ever made any derogatory statements about Thomas' religion and the record contains no other specific instances of Hemmerling making any such derogatory statements. (Def. 56.1 Resp. ¶ 62; Pl. 56.1 Resp. ¶ 36.)[5] Besides Hemmerling, no one at the City made offensive comments to Thomas about her religion. (*Id.*).

In June 2007, someone placed a trash can in the hallway outside of Thomas' office. (Pl. 56.1 Resp. ¶ 33.) On two or three different occasions, someone discarded the remnants of a fish dinner in that trash can, causing her office to smell. (*Id.*) Thomas does not know who placed the trash can near her office or who placed the fish into the trash can. (*Id.*) She believes that someone placed the fish into the garbage can to criticize her religious beliefs because "Catholics eat fish on Friday." (Thomas Dep. at 126:15-20; Pl. 56.1 Resp. ¶ 33.) Thomas did not move the trash can or ask anyone else to move it. (Pl. 56.1 Resp. ¶ 33.)

Thomas believes that her coworkers received better treatment than she did. (Pl. 56.1 Resp. ¶¶ 46, 47.) Before the City hired her, Thomas indicated that she wanted to take two days off in July 2007. (Def. 56.1 Ex. J.) Although she did not submit a written request for the time off, she received

---

[5] Thomas attempts to deny the assertions in Pl. 56.1 Resp. ¶ 36, claiming that Hemmerling called her a "stupid Witness" on a daily basis. However, her contentions are not supported by the portions of the record she cites. *See* Thomas Dep. at 52:12; 58:14-17; 60:15-19; 68:1-8; 100:1-18; 255:3-5 (while Hemmerling may have called Thomas "stupid" on a regular basis, Thomas only identified a single instance where Hemmerling called her a "stupid Witness"). Because the portions of the record that Thomas cites do not controvert the assertions in Pl. 56.1 Resp. ¶ 36, the Court deems Pl. 56.1 Resp. ¶ 36 admitted. *See* L.R. 56.1(b)(3)(C).

two unpaid days off. (Pl. 56.1 Resp. ¶ 43; Def. 56.1 Ex. J.).[6] When she returned, she received a Personnel Action Request Form, indicating that she had been approved for two days of "excused absence without pay–non-disciplinary." (Pl. 56.1 Resp. ¶ 43; Def. 56.1 Ex. J.) Thomas, Hemmerling and O'Connell signed the form. (Def. 56.1 Ex. J.) Thomas concedes that she did not receive discipline for taking the days off in July 2007. (Pl. 56.1 Resp. 44.)[7] Nonetheless, she believes that Salinski received better treatment with respect to receiving days off during her probationary period. (Pl. 56.1 Resp. ¶ 45.) Salinski received two weeks of vacation time during her probationary period because she had scheduled a trip before the City hired her. (*Id.*; Thomas Dep. at 211:5-8.) Although Tomas believes that Salinski received better treatment than she did, Thomas does not know whether Salinski made a written request for the vacation, received discipline for taking the time off or received pay for the two weeks that she spent away from the office. (Pl. 56.1 Resp. ¶ 45.)

Thomas also believes that her coworkers received better treatment than she did because they could have their name tags on their doors and list their qualifications on their business cards. (Pl. 56.1 Resp. ¶¶ 47, 48, 49.) When Thomas noticed that the nurses in the Medical Section kept name tags on the doors to their offices, she placed her name on her door. (Pl. 56.1 Resp. ¶ 48; Thomas

---

[6] To controvert this statement, Thomas states, "Plaintiff made her request known from the first day of hire. Plaintiff was not instructed to submit a written request. As the days approached Plaintiff reminded Supervisor Jones. Ms. Jones told me she would take care of it since she was Plaintiff's supervisor. Plaintiff had two days off but was not paid for one that was used for a medical visit." Because that statement actually supports the assertion that Thomas did not submit a written request for time off, it is an improper denial.

[7] In her deposition, Thomas admitted that she did not receive discipline relating to the days off:

Q:     Other than that [Personnel Action Request Form], did you receive any other discipline related to those days off?

A:     No.

Thomas Dep. at 149:12-16. However, she attempts to controvert that admission by stating in an affidavit that she also received a verbal reprimand. Parties may not use self-serving affidavits to contradict prior deposition testimony. *See Piscione v. Ernst & Young L.L.P.*, 171 F.3d 527, 532 (7th Cir. 1999) ("[W]hen a conflict arises between a plaintiff's own sworn deposition and his sworn affidavit, the deposition testimony overrides statements made in the affidavit."). Accordingly, the record shows that the City did not discipline her for taking days off in July 2007.

Dep. at 205:5-7.)  Hemmerling removed the name tag from Thomas' door.  (Pl. 56.1 Resp. ¶48; Thomas Dep. at 205:8-11.)  Thomas still does not know why Hemmerling removed the name tag from the door.  (Pl. 56.1 Resp. ¶ 48.)  However, Hemmerling allowed nurse Beverly Holowich ("Holowich") to keep her name tag on the outside of her door.  (Thomas Dep. at 205:5-7.)

With respect to business cards, Thomas ordered cards that reflected all of her qualifications, so that her name would appear as "Maria Antoinette Thomas, BSN, RN, CM."  (Pl. 56.1 Resp. ¶ 49; Thomas Dep. at 206:13-17.)  When she received her business cards, however, Thomas' name appeared as "Maria Antoinette Thomas, RN," indicating only that she had attained the qualification of registered nurse, which she had.  (Pl. 56.1 Resp. ¶ 49.)

In addition to civilian nurses, such as Thomas, the Medical Section employed sworn police officers as nurses.  (Thomas Dep. at 207:2-7.)  Police officers serving as occupational nurses could use the initials "PO, RN" on their business cards to reflect their status as sworn officers.  (Pl. 56.1 Resp. ¶ 49; Thomas Dep. at 207:2-7.)  For example, Holowich, a sworn officer, had business cards that displayed her name as, "Beverly Holowich, PO, RN."  (Thomas Dep. at 207:2-4.)  Thomas does not know how other civilian occupational nurses displayed their names on their business cards.  (Pl. 56.1 Resp. ¶ 49.)

To make complaints against coworkers for harassment, employees of the Chicago Police Department can file a complaint register ("CR").  (Pl. 56.1 Resp. ¶ 37.)  While Thomas knew of the CR procedure for filing complaints and she knew that probationary employees had the ability to file CRs, she opted not to complain about perceived religious harassment during her probationary period because she felt that it was not a prudent course of action.  (Thomas Dep. at 43:7-22, 44:17-19.) Instead, she wanted to "stay under the radar" until she finished her probationary period and became a member of the union.  (Pl. 56.1 Resp. ¶ 40.)  She also knew that she could file a charge of

discrimination with the EEOC to complain about harassment or discrimination because she had previously filed charges of discrimination against two former employers. (Pl. 56.1 Resp. ¶ 41.) However, she did not file a charge of discrimination against the City until after her termination. (*Id.*) Even when Thomas complained to Hemmerling that she believed that other employees had been "undermining her work," she did not tell Hemmerling that she thought the employees acted against her because of her religion. (Pl. 56.1 Resp. ¶ 42.)

During the course of Thomas' employment, Hemmerling met with Thomas at least twice per week to discuss her performance issues at work. (Pl. 56.1 Rep. ¶ 19.) During the meetings, Hemmerling told Thomas that Thomas' entries into the computerized tracking system contained misspellings of common medical terms and unclear abbreviations, unsupported extensions of time off for officers, unclear documentation of medical conditions and evidence that Thomas failed to follow-up with officers when necessary. (*Id.*) After discussing these concerns with Thomas, Hemmerling informed Schaedel of Thomas' performance issues and in May 2007 documented her deficiencies in a memo to the Personal Division. (Pl. 56.1 Resp. ¶ 21.)[8] In June 2007, Hemmerling assigned an occupational health nurse with more experience to oversee and assist Thomas but her work did not improve. (Pl. 56.1 Resp. ¶ 22.)

On August 9, 2007, Hemmerling, Schaedel and O'Connell met to discuss Thomas' performance. (Pl. 56.1 Resp. ¶ 23.) In preparation for the meeting, Hemmerling created a memo to summarize her concerns with the deficiencies in Thomas' skills and performance. (*Id.*) The memo included printouts from at least fifteen of Thomas' entries in the computerized tracking

---

[8] In an attempt to controvert this assertion, Thomas cites to her affidavit, which states, "I am unaware of Hemmerling discussing my work performance with Schaedel." Because her lack of knowledge does not properly controvert the statement contained in Pl. 56.1 Resp. ¶ 21, the Court deems that statement admitted. *See* L.R. L.R. 56.1(b)(3)(C).

system to illustrate the errors that the memo described. (*Id.*; Def. Ex. F, G, H.) On August 24, 2007, Hemmerling recommended to Schaedel and O'Connell that the City should terminate Thomas' employment before her probationary period ended. (Pl. 56.1 Resp. ¶ 24.) Terminating Thomas required approval from both Schaedel and O'Connell. (Pl. 56.1 Resp. ¶ 54.) Neither Schaedel nor O'Connell knew that Thomas was a Jehovah's Witness when they reviewed Hemmerling's recommendation. (Pl. 56.1 Resp. ¶ 55.) Schaedel and O'Connell reviewed the printouts of Thomas' entries and agreed that the entries contained errors. (Pl. 56.1 Resp. ¶ 25; Schaedel Aff. ¶ 7; O'Connell Aff. ¶ 5.) After reviewing the errors, Schaedel and O'Connell agreed with the recommendation to terminate Thomas. (Pl. 56.1 Resp. ¶ 25.)[9] Once Schaedel and O'Connell decided that the City should terminate Thomas, O'Connell conferred with her supervisor, Assistant Deputy Superintendent Anne Egan ("Egan"). (Pl. 56.1 Resp. ¶ 26.) O'Connell had no power to terminate Thomas without first obtaining Egan's approval. (*Id.*; Pl. 56.1 Resp. ¶ 54.)

After Egan agreed that the City should terminate Thomas, on September 13, 2007, Schaedel informed Thomas that the City had decided to terminate her employment for poor work performance, effective September 14, 2007. (Pl. 56.1 Resp. ¶¶ 27-28.) Thomas had not completed her probationary period at the time of her termination. (*Id.*) Nobody made reference to Thomas' religion at the September 13, 2007 meeting and nobody ever told her that the City fired her because of her religion. (Pl. 56.1 Resp. ¶¶ 51, 53.)

On December 18, 2007, Thomas filed a charge of discrimination with the EEOC, alleging that the City terminated her because of her religion. (Def. Ex. D.) On February 14, 2008, she

---

[9] In attempting to controvert this statement, Thomas states, "Schaedel had no medical background. On several occasions he would inquire of his nurses' medical advice." Because that statement does not controvert the assertion that Schaedel and O'Connor reviewed the printouts before agreeing with the recommendation to terminate Thomas, the Court deems Pl. 56.1 Resp. ¶ 25 admitted.

received a right-to-sue letter based on her allegations of religious discrimination. (Compl. ¶ 7.) She filed suit against the City on May 12, 2008. (Compl.) Based on the Court's previous rulings and Thomas' decision to voluntarily abandon her retaliation claims, the hostile work environment and religious discrimination claims in Count I are the only remaining claims.

Finally, with respect to the undisputed facts, the Court notes that Thomas did not take advantage of the discovery process. She did not serve the City with written discovery and she did not depose any witnesses. In an attempt to create disputed issues of material fact, she only submitted her own self-serving affidavit that failed to provide the foundation for her assertions and contained hearsay and other inadmissible evidence throughout the document. Making matters worse, many of the assertions contained within her affidavit do not contain support from the evidentiary record. Because of the deficiencies in Thomas' affidavit, the Court would have been justified in striking the portions of it that are without factual support in the record. *See, e.g., Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004) ("[S]elf-serving statement contained in an affidavit will not defeat a motion for summary judgment when those statements are without factual support in the record."). Regardless, the Court need not strike Thomas' affidavit because the self-serving statements contained within the affidavit do not even dispute the factual assertions that the City made in its L.R. 56.1 statement. For example, in an attempt to deny the City's assertion regarding the chain of command, Thomas merely states "Plaintiff does not know who had to formally approve termination . . . ." (Pl. 56.1 Resp. ¶ 13.) Additionally, in an attempt to dispute whether Hemmerling met with her supervisors at the City, Thomas states, "I am unaware of Hemmerling discussing my work performance with Schaedel." (Pl. 56.1 Resp. ¶ 21.) To controvert the assertion that the City's decisionmakers did not have knowledge of Thomas' religion, Thomas claims, "Plaintiff does not

know what they knew." (Pl. 56.1 Resp. ¶ 55.) The self-serving affidavit unsupported by the record does not controvert the City's assertions.

**STANDARD OF REVIEW**

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

### I.  Discriminatory Discharge

Title VII prohibits employers from discharging employees because of the employee's religion.  *See* 42 U.S.C. § 2000e-2(a)(1).  Plaintiffs may show discrimination by utilizing either the direct or indirect methods of proof.  *See Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008).

#### A.  *Direct Method*

A plaintiff may establish unlawful discrimination under the direct method by presenting direct or circumstantial evidence that creates a "convincing mosaic of discrimination."  *See Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009).  Direct evidence of discrimination essentially consists of an admission that the employer took an adverse employment action against an employee based upon prohibited animus.  *See Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Circumstantial evidence of intentional discrimination can consist of suspicious timing, ambiguous statements, differing treatment of similarly situated employees, personal animus, pretext and other evidence which allows the jury to reasonably infer discrimination.  *See Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (citing *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007)).  To survive summary judgment, the plaintiff must present evidence of a link between her protected status and the adverse employment action.  *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) ("Bigotry, per se, is not actionable.  It is actionable only if it results in injury to a plaintiff; *there must be a real link between the bigotry and an adverse employment action*.") (emphasis added) (citation omitted).

To demonstrate a causal connection between an employee's protected status and an adverse employment action, the plaintiff must submit evidence that "the *decisionmaker* has acted for prohibited reason.  A decisionmaker is the person responsible for the contested decision."  *Rogers*,

320 F.3d at 754 (emphasis in original) (quotation omitted). Here, Schaedel, O'Connell and Egan had to approve the decision to terminate Thomas' employment; Hemmerling did not have the authority to make the decision. Schaedel and O'Connell did not know Thomas' religion at the time they decided to recommend her termination. Additionally, nothing in the record suggests that Egan knew that Thomas was a Jehovah's Witness when she accepted the recommendations of Schaedel and O'Connell. Because the people who decided to fire Thomas did not know her religion at the time they acted, they could not have made the decision because of her religion.

Although plaintiffs generally must provide evidence that the decisionmaker acted for a prohibited reason to establish a *prima facie* case of discriminatory termination, in situations where subordinates have exerted such influence over the employment decision that the decisionmaker merely acted as a conduit for the subordinate's discriminatory intent, courts impute the discriminatory animus of the subordinate to the employer because the decisionmaker acted as the subordinate's "cat's paw." *See Long v. Teachers' Retirement System of Illinois*, 585 F.3d 344, 351 (7th Cir. 2009); *Staub v. Proctor Hosp.*, 560 F.3d 647, 659 (7th Cir. 2009); *Metzger v. Ill. State Police*, 519 F.3d 677, 682 (7th Cir. 2008); *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 917-918 (7th Cir. 2007). Liability under the cat's paw theory requires a decisionmaker's "blind reliance" on the subordinate's recommendation. *See Staub*, 560 F.3d at 659. Nonetheless, when the decisionmaker "is not wholly dependent on a single source of information and conducts her own investigation into the facts relevant to the decision," the employer avoids cat's paw liability. *See id.* at 659 (citing *Brewer*, 479 F.3d at 918).

Here, Thomas claims that Hemmerling disliked her because of her religion and that discriminatory animus caused Hemmerling to recommend Thomas' termination to Schaedel and O'Connell. Additionally, she claims that the Court should impute Hemmerling's discriminatory

animus to Schaedel, O'Connell and Egan because they merely rubber-stamped Hemmerling's recommendation to fire Thomas. In support of her claim that Hemmerling felt animosity towards Thomas because of her religion, Thomas relies upon Hemmerling's statements towards her.

Isolated comments in the workplace that are mere "stray remarks" are insufficient to establish that discriminatory animus motivated a particular employment decision. *See Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006). Nonetheless, a supervisor's statements expressing discriminatory feelings can provide direct evidence of discrimination when the supervisor provides input into the decision-making process and makes the statements around the time of, and in reference to, the complained-of adverse employment action. *See Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 774 (7th Cir. 2008). For example, when a mayor made racist and ageist comments about certain police officers in recommending that the city council deny the officers the pay increases that they sought, his comments provided direct evidence of discriminatory animus. *See Hunt v. City of Markham*, 219 F.3d 649, 652-53 (7th Cir. 2000).

Here, although disputed by Hemmerling, Thomas contends that on one occasion in May 2007, Hemmerling told Thomas that she would not "pray a stupid Jehovah prayer" for Thomas' ill daughter and that on another occasion around that time, Thomas heard Hemmerling call her a "stupid Witness" after the two women disagreed about the best treatment plan for one of the Medical Section's patients. These isolated remarks, however, even if they did occur, are insufficient to constitute direct or circumstantial evidence that the decision to terminate Thomas was motivated by discriminatory animus. Unlike the mayor in *Hunt*, the record reflects that Hemmerling made neither derogatory comment in reference to the City's decision to terminate Thomas' employment. Rather, Thomas claims that Hemmerling made the "stupid Jehovah prayer" comment in reference to the hospitalization of Thomas' daughter and that she called Thomas a "stupid Witness" after a work-

related disagreement. Additionally, the two comments were isolated in time from Hemmerling's recommendation; Hemmerling made those statements to Thomas approximately two to three months before she made her termination recommendation on August 24, 2007. Because Hemmerling's statements about Thomas' religion, if made, were stray remarks unrelated to the City's decision to fire her, the statements do not provide direct evidence of a discriminatory animus on Hemmerling's part. Additionally, the record contains no further references to specific comments that Hemmerling made that could provide direct evidence that Hemmerling recommended that the City fire Thomas because of Thomas' religion.

Moreover, even if Hemmerling's alleged statements to Thomas established that Hemmerling held a discriminatory animus based upon Thomas' religion, Schaedel and O'Connell conducted an independent review of Thomas' work after they received Hemmerling's recommendation in August 2007 and before they asked Egan to approve Thomas' termination. After reviewing the entries that Thomas made into the Medical Section's computerized tracking system, Schaedel and O'Connell agreed that Thomas' work contained many errors and that they should fire her before her probationary period of employment ended. Only after Schaedel and O'Connell conducted an independent review of Thomas' work did they ask Egan to approve firing Thomas. Because Schaedel and O'Connell reviewed Thomas' work on their own before agreeing with Hemmerling's recommendation, even if Hemmerling made her recommendation because of religious animosity towards Thomas, the cat's paw theory does not provide a basis for imputing that animosity to the decisionmakers. Accordingly, Thomas has failed to establish a *prima facie* case of discriminatory termination under the direct method.

B.    *Indirect Method*

15

Under the indirect method of proving discrimination, a plaintiff must first establish a *prima facie* case of discrimination by establishing: 1) membership in a protected class; 2) satisfactory job performance; 3) an adverse employment action; and 4) similarly situated employees outside of the plaintiff's protected class received more favorable treatment. *See Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009). The failure to satisfy all four elements under the indirect method dooms a discrimination claim. *See Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004). Once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for taking the adverse employment action. *See Antonetti*, 563 F.3d at 591. If the employer satisfies that burden, to avoid summary judgment, the plaintiff must establish that a genuine issue of fact exists as to whether the employer's nondiscriminatory reason is mere pretext for unlawful discrimination. *See id.* The City concedes that Thomas belongs to a protected class on account of her religion and that it took an adverse employment action against her.

For a Title VII plaintiff to establish the element of satisfactory job performance, she must produce some evidence that she met the employer's legitimate business expectations. *See Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 743 (7th Cir. 1999). Here, Hemmerling met with Thomas twice each week to discuss Thomas' poor performance within the Medical Section. After the meetings, Hemmerling documented some of the specific difficulties that Thomas had, such as using unclear abbreviations in the computerized tracking system, misspelling medical terms, giving officers extended time off without proper medical support and making unclear documentation of officers' medical conditions. In an attempt to provide Thomas with more assistance, Hemmerling assigned a more experienced occupational nurse to oversee Thomas' work in June 2007. Despite this increased oversight, Thomas' quality of work did not improve. Thomas has not offered any

evidence, such as positive evaluations or assessments from others within the Medical Section, that would tend to establish that she met the City's legitimate expectations for its occupational nurses at the time of her termination. Because she has not offered evidence that she met the City's legitimate business expectations and because the record shows that she was not performing satisfactorily when the City decided to terminate her employment, Thomas cannot establish a *prima facie* case of religious discrimination under the indirect method.

Even if Thomas had produced evidence that she performed her job satisfactorily, she still must identify a similarly situated employee outside of her protected class that received better treatment to establish a *prima facie* case of discriminatory discharge. *See Antonetti*, 563 F.3d 591. A similarly situated employee is "directly comparable to [the plaintiff] in all material respects." *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005). Therefore, to establish a *prima facie* case of discrimination under the indirect method, the plaintiff must show that "two employees dealt with the same supervisor, were subject to the same workplace rules, and engaged in similar conduct, but nonetheless received disparate treatment for no apparent legitimate reason." *Adams*, 324 F.3d at 940.

Here, while Thomas claims that she received worse treatment than nurses who were not Jehovah's Witnesses, she does not identify any similarly situated nurse by name. The Court assumes that Thomas points to Salinski as a similarly situated employee because Salinski is the only other probationary occupational nurse identified in the record. Thomas and Salinski each started working in the Medical Section at the same time and they each reported to Hemmerling. However, Thomas has produced no evidence that Salinski had similar performance issues at work. While the record shows that Hemmerling met with Thomas frequently to discuss her poor performance, nothing in the record suggests that Salinski had similar performance issues. The record is silent regarding

whether Salinski had good or bad performance reviews, used the same abbreviations as Thomas did in the computerized tracking system, spelled medical terms correctly or properly supported extensions of time off for officers. In fact, the record does not even establish whether Salinski continued to work as an occupational nurse in the Medical Section after her probationary period ended. Because Thomas has failed to produce evidence that would allow the Court to analyze whether she was similarly situated to Salinski in all material respects, she has not satisfied her burden of establishing that the City treated her differently than a similarly situated employee outside of her protected class. Accordingly, even if Thomas had introduced evidence to show that she met the City's business expectations, she would not have been able to establish a *prima facie* case of discriminatory termination under the indirect method.

Because Thomas has failed to establish a *prima facie* case of discriminatory discharge under the direct and indirect methods, the City is entitled to judgment as a matter of law with respect to Thomas' claim for discriminatory discharge.

## II.    Hostile Work Environment

Thomas also claims that the City subjected her to a hostile work environment based upon her religion. Employers violate Title VII if discrimination based upon race, national origin, gender or age creates a hostile or abusive work environment. *See Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1033 (7th Cir. 2003). To establish a hostile work environment, the plaintiff must submit evidence that: 1) she was subject to unwelcome harassment; 2) the harassment was based upon a protected characteristic; 3) the harassment was severe and pervasive so as to alter the conditions of the employee's environment and create a hostile work environment; and 4) a basis for employer liability exists. *See Atanus*, 520 F.3d 662, 676 (7th Cir. 2008). For a work environment to be "hostile," the harassment must be "both subjectively and objectively so severe or pervasive as

18

to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005). To determine whether the harassment was objectively hostile, courts consider all of the circumstances, including frequency and severity of the conduct, whether it is threatening, humiliating or merely offensive, and whether the harassment unreasonably interferes with the employee's work. *See Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002); *Venters v. City of Delphi*, 123 F.3d 956, 975-76 (7th Cir. 1997).

Federal civil rights laws do not exist to ensure that employees enjoy workplaces that are free from profanity or incivility; to be actionable, the conduct *must* either have a discriminatory character or purpose. *See Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999); *Vore v. Ind. Bell Tel. Co., Inc.*, 32 F.3d 1161, 1162 (7th Cir. 1994) (noting that Title VII "does not guarantee a utopian workplace, or even a pleasant one.").

Here, Thomas claims that the following incidents created a religiously hostile work environment for her: 1) receiving questions from coworkers regarding her faith; 2) exclusion from birthday parties; 3) Finnegan "undermining or sabotaging" her work; 4) Hemmerling making two comments about her religion; 5) someone placing fish in the trash can outside of her office; 6) receiving "less favorable" treatment than other employees with respect to days off during her probationary period; 7) not being able to place a name tag outside of her door; and 8) not being able to display all of her qualifications on her business cards. However, Thomas has offered no evidence to demonstrate that any of the allegedly harassing conduct was because of her religion or that it was sufficiently severe or pervasive as to alter the conditions of her employment.

For example, Thomas first claims that co-workers' questions about her faith and her subsequent exclusion from office birthday parties created a hostile work environment; however, the record establishes that Thomas was willing to discuss her faith with her coworkers and that

19

questions about her religion did not offend her. The record also demonstrates that, contrary to Thomas contention, she was not excluded from office birthday parties, rather she herself decided not to attend these parties due to her religion. To be sure, the record reveals that when a co-worker told Thomas that another Jehovah's Witness used to come to the office parties, in an attempt to persuade Thomas to attend, Thomas simply walked away from the conversation. Additionally, the undisputed facts demonstrate that Thomas' co-workers never criticized Thomas for choosing not to attend the parties. (*Id.* at 105:10-12.) Therefore, the record is devoid of evidence to support Thomas' contention that allegedly harassing conduct was because of her religion or that it was subjectively and objectively hostile.

Next, Thomas claims she was subjected to a hostile work environment because Finnegan was "undermining or sabotaging" her work. However, even if Thomas could establish that Finnegan was "undermining or sabotaging" her work, she offers no evidence to support the inference that Finnegan was "undermining or sabotaging" her work based on her religion. In fact, the record reveals that Thomas did not mention her religion at all when she complained to Hemmerling about her co-workers, but instead maintained that her co-workers undermined her work because they disagreed with her assessment of the proper treatment and referrals for certain officers. Because the record is devoid of evidence to support Thomas' speculation that Finnegan's motivation for undermining her work was because of her religion, she can not maintain a claim of hostile work environment based on Finnegan's alleged conduct.

Thomas also claims that she was subjected to a hostile work environment because Hemmerling made two negative remarks about her religion. Although disputed by Hemmerling, Thomas asserts that Hemmerling made the first remark in May 2007, after Thomas received authorization to leave early to care for her sick daughter. Hemmerling went to Thomas' office and

said, "I will pray for you but not a stupid Jehovah prayer." Thomas asserts that Hemmerling made the second remark after she and Thomas had a work related disagreement. While walking away from Thomas' office, Hemmerling mumbled under her breath that Thomas was "a stupid Witness." The record does not demonstrate that Hemmerling, or any other employee, made any other derogatory comments regarding Thomas's religion. As previously noted, in order to establish a hostile work environment, Thomas must show the harassment to be "both subjectively and objectively so severe or persuasive as to alter the conditions of employment and create an abusive working environment." *Whittaker,* 424 F.3d at 645. Here, even accepting Thomas' assertions as true, the record supports that Hemmerling made only two isolated remarks to Thomas, as opposed to a "concentrated or incessant barrage," which would likely have a greater emotional impact.. *Baskerville v. Culligan Intern. Co.,* 50 F.3d 428, 431 (7th Cir. 1995). Further, the remarks at issue were not made in public; if made, they were only made in Thomas' presence and one was barely audible as it was mumbled under Hemmerling's breath. Because Hemmerling's comments were infrequent and merely offensive as opposed to threatening and humiliating, Thomas has failed to establish that Hemmerling's two isolated remarks, over the period of her employment, were objectively so severe or persuasive as to create a hostile work environment. *See Cerros,* 288 F.3d at 1045.

Thomas next claims that she suffered from a hostile work environment because an unidentified co-worker, on two or three occasions, placed the remnants of a fish dinner in a garbage can outside her office. Thomas admits that she does not know who threw the fish into the trash can and has not offered any evidence, beyond her own assertion, to support her conclusion that the act of discarding fish into her trash can was critical of her religious beliefs. While Thomas may have felt that the act of discarding fish into a trash can outside her office was an affront to her religious

beliefs,[10] she has failed to set forth evidence to establish that this conduct was motivated by her religion or that a reasonable person would find this behavior objectively hostile.

Next, Thomas claims that was subjected to a hostile work environment when she received "less favorable" treatment than a co-worker when she asked for days off during her probationary period. The record indicates that Thomas wanted to take two days off in July, 2007, but did not file a written request to do so. Nonetheless, Thomas was allowed to take the time off and was not disciplined for her failure to follow proper procedure. Thomas asserts that another employee, who she does not identify, but who the court assumes is her co-worker Salinski, received more favorable treatment when she requested time off. However, the record reveals that Thomas does not know whether Salinski, unlike herself, submitted a written request for time off, and if not, whether she was disciplined for failing to follow proper procedure. Thomas also concedes that she does not know whether Salinski received pay while on vacation. Because Thomas can not even establish that Salinski was similarly situated and treated more favorably, she can not establish that she received "less favorable" treatment because of her religion. Additionally, Thomas' concession that she was not disciplined for her failure to file a written request for time off, and was still allowed to take the time off, establish that the treatment she did receive was not sufficiently severe to create a hostile work environment. Moreover, even if Thomas had established that she received "less favorable" treatment, Thomas has set for no evidence to indicate that her religion was in any way a motivating factor for the treatment she received.

Lastly, Thomas claims that she was subjected to a hostile work environment when she was not allowed to place a name tag outside her door and was not allowed to list all of her qualifications

---

[10] The Court notes that Thomas' subjective belief that this conduct was harassing is cast into doubt by the record, which indicates that Thomas never bothered to move the garbage can or ask that it be moved. (Pl. 56.1 Resp. ¶ 33.)

on her business cards.  However, Thomas concedes that she does not know why Hemmerling removed her name tag from her door.  And, the record reveals that police officers serving as occupational nurses could use the initials "PO, RN" on their business cards to reflect their status as sworn officers but that Thomas does not know how other civilian occupational nurses, such as herself, displayed their names on their business cards.  In short, Thomas has provided no evidence to link the removal of her name tag or the changing of her business cards to her religion.

Finally, even if Thomas had established that the incidents she complains of were objectively and subjectively hostile, there is no basis for employer liability because the record reveals that she never complained to the City about the allegedly harassing behavior, despite the fact that the City had a complaint register where employees could file complaints and report harassment.  *See Burlington Indus., Inc. V. Ellerth*, 524 U.S. 742, 765 (1998) (no employer liability where: 1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and 2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provide).

Because Thomas has failed to submit evidence that she was harassed because of her religion, or that the harassment was sufficiently severe or pervasive as to alter the conditions of her employment and create an abusive working environment, the City is entitled to judgment as a matter of law with respect to Thomas' hostile work environment claim.

### CONCLUSION AND ORDER

For the reasons stated, the City's Motion for Summary Judgment is granted.

Virginia M. Kendall, United States District Judge
Northern District of Illinois

23

Date:   January 28, 2010